IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Charlottesville Division

LARRY MONROE, on behalf of himself and
all others similarly situated,

       Plaintiff,

v.

CITY OF CHARLOTTESVILLE, VIRGINIA,
et al.,

       Defendants.

Civil Action No. 3:05-CV-00074

## PLAINTIFF'S MEMORANDUM IN SUPPORT OF HIS REQUEST FOR CLASS CERTIFICATION

Plaintiff filed the present action under 42 U.S.C. § 1983 alleging that the Defendants'

policy of approaching and requesting DNA samples only from African-American men in the course

of a criminal investigation violated the Plaintiff's civil rights and those of others similarly situated.

In his Complaint the Plaintiff requested certification of a class under Fed. R. Civ. P. 23 and an

evidentiary hearing with respect to the request was held on July 6, 2006, at which time the Court also

heard preliminary argument.  This memorandum is submitted in support of the request for class

certification and in amplification of the argument previously presented to the Court.

<u>Applicable Legal Rules</u>

Class certification is governed by Fed. R. Civ. P. 23 and the decision whether to grant certification is a discretionary one, reviewed only for abuse.  *Lienhart v. Dryvit Sys., Inc.*, 255 F.3d 138, 146 (4th Cir. 2001).  Plaintiffs bear the burden of demonstrating satisfaction of the Rule 23 requirements and a district court is required to make findings on whether the plaintiffs carry their burden. *Thorn v. Jefferson-Pilot Life Ins. Co.*, 445 F.3d 311, 317 (4th Cir. 2006).  Rule 23 is divided into a number of parts; for a class to be certified, all of the requirements of Rule 23(a) must be satisfied and the proposed class must fall into one of the three categories set forth in Rule 23(b).

Rule 23(a) provides that "One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class."  These requirements are often referred to by the short-hand terms numerosity, commonality, typicality and adequacy.  *Thorn*, 445 F.3d at 318.

Numerosity does not require the existence of a fixed number of plaintiffs, only so many as to make joinder impractical.  While some courts, including at least one judge of this court, have adopted certain numbers as being presumptively sufficiently numerous, *see, e.g., Talbot v. GC Serv's, L.P.*, 191 F.R.D. 99, 102 (W.D. Va. 2000)  ("Where the class is twenty-five or more, joinder is usually presumed impracticable."); *Consolidated Rail Corp. v. Town of Hyde Park*, 47 F.3d 473, 483 (2d Cir. 1995) ("numerosity is presumed at a level of 40 members"); *Massengill v. Board of Education*, 88 F.R.D. 181, 184 (N.D. Ill. 1980) (as a general rule joinder of over 100 people is

2

impractical), the Fourth Circuit has not, apparently, done so.  The Fourth Circuit has, however, approved class certification where there were as few as eighteen members.  *Cypress v. Newport News General & Nonsectarian Hospital Ass'n*, 375 F.2d 648, 652 (4th Cir. 1967).

"Commonality requires that there are questions of law or fact common to the class. A common question is one that can be resolved for each class member in a single hearing, such as the question of whether an employer engaged in a pattern and practice of unlawful discrimination against a class of its employees.  A question is not common, by contrast, if its resolution turns on a consideration of the individual circumstances of each class member." *Thorn*, 445 F.3d at 319.  This element does not require that all or a certain predominant number of issues be common; Rule 23(a)'s commonality requirement necessitates only "that there be at least one question of law or fact common to the class." *Pitt v. City of Portsmouth*, 221 F.R.D. 438, 444 (E.D. Va. 2004); *Massengill*, 88 F. R. D. at 184.

"The essence of the typicality requirement is captured by the notion that 'as goes the claim of the named plaintiff, so go the claims of the class.'" *Deiter v. Microsoft Corp.*, 436 F.3d 461, 466 (4th Cir. 2006) (citation omitted).  "The typicality requirement goes to the heart of a representative parties' [*sic*] ability to represent a class, particularly as it tends to merge with the commonality and adequacy-of-representation requirements.  The representative party's interest in prosecuting his own case must simultaneously tend to advance the interests of the absent class members. For that essential reason, plaintiff's claim cannot be so different from the claims of absent class members that their claims will not be advanced by plaintiff's proof of his own individual claim. That is not to say that typicality requires that the plaintiff's claim and the claims of class members be perfectly identical or perfectly aligned.  But when the variation in claims strikes at the heart of

3

the respective causes of actions, we have readily denied class certification." *Id.* at 466-67 (internal quotations and citations omitted).

Adequacy of representation is established "where that person [the class representative] (I) does not have interests that are adverse to the interests of the class, (ii) has retained competent counsel, and (iii) is otherwise competent to serve as class representative." *In re Cable and Wireless, PLC, Securities Litigation*, 217 F.R.D. 372, 375 n.5 (E.D. Va. 2003) (citation omitted); *see, e.g., Robinson v. Gillespie*, 219 F.R.D. 179, 185 (D. Kan. 2003) ("Under Rule 23(a)(4), the proposed class representatives must assure the court that their interests are sufficient to induce vigorous advocacy on their part; that their interests are not antagonistic to those of class members; and that they have the means, including competent counsel, to pursue their case." (citation omitted)); *Wagner v. NutraSweet Co.*, 170 F.R.D. 448, 451 (N.D. Ill. 1997) ("The adequacy requirement has three elements: (1) the chosen class representative cannot have antagonistic or conflicting claims with other members of the class; (2) the named representative must have a sufficient interest in the outcome to ensure vigorous advocacy; and (3) counsel for the named plaintiff must be competent, experienced, qualified, and generally able to conduct the proposed litigation vigorously." (internal quotations and citations omitted)).

Provided that the foregoing Rule 23(a) criteria are met, class certification is permitted as long as at least one of the provisions of Rule 23(b) is satisfied. Rule 23(b) provides that

> An action may be maintained as a class action if the prerequisites of subdivision (a) are satisfied, and in addition:
>
> (1) the prosecution of separate actions by or against individual members of the class would create a risk of (A) inconsistent or varying adjudications with respect to individual members of the class which would establish incompatible standards of conduct for the

party opposing the class, or (B) adjudications with respect to individual members of the class which would as a practical matter be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests; or

        (2) the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole; or

        (3) the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. The matters pertinent to the findings include: (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action.

Fed. R. Civ. P. 23(b).

## The Claims

While the Court does not review the *merits* of the claims in making a determination on class certification,[1] the *nature* of the claims may nonetheless be informative in analyzing the issues of typicality and commonality.

In Count I the Plaintiff alleges a violation of rights under the Equal Protection Clause of the Fourteenth Amendment. The Plaintiff alleges that the Defendants' policies at issue in this case violated his equal protection rights in two fundamental ways: (1) first, Plaintiff alleges that the

---

[1]*See infra* at 14.

Defendants have never pursued such a program of requesting DNA samples from members of the community at large to establish innocence when an assailant has been alleged to have been white, thereby presenting a classic example of race-based discrimination; and (2) the Plaintiff alleges that the decision to approach him and other class members and seek a DNA sample was based solely on race and this violates the right to equal protection, regardless of whether whites have been similarly treated on any other occasion.. Thus, in these two respects, Plaintiff claims Defendants' policies violate the right to equal protection.  *See, e.g., United States v. Travis*, 62 F.3d 170, 173-74 (6th Cir. 1995) (holding that "consensual searches may violate the Equal Protection Clause when they are initiated solely based on racial considerations.");[2] *United States v. Avery*, 137 F.3d 343, 354 (6th Cir. 1997) (stating "A person cannot become the target of a police investigation solely on the basis of skin color.  Such selective law enforcement is forbidden." (footnote omitted)); *cf. Brown v. City of Oneonta*, 221. F3d 329, 337-38 (2d Cir. 1999) (finding no equal protection violation where defendants were able to establish factors other than race which caused them to approach plaintiffs).[3]

Counts II and III rest on the Fourth and Fourteenth Amendment rights to be free from unreasonable searches and seizures. That is, having an encounter with the Plaintiff solely because of his race, and having encounters with members of the black community when, in similar situations, the police do not have encounters with members of the white community, makes those encounters

---

[2]Interestingly enough, the government conceded as much in *Travis*.  *Id.* at 174.

[3]The Second Circuit's holding in *Brown*, and the Defendants' apparent position at the evidentiary hearing that their ability to establish factors in addition to race ("race plus" as it were) precludes an Equal Protection Clause claim, are undercut by the Supreme Court's subsequent decision in *Grutter v. Bollinger*, 539 U.S. 306 (2003), concluding that even though race was only one factor "among many" considered by the government, the use of race as one of the factors nonetheless mandated strict scrutiny of the entire program.

6

legally and inherently unreasonable. Finally, in Count III, the Plaintiff contends that the actual taking of DNA samples from him, and members of the sub-class relevant to Count III, constituted an unreasonable search and seizure both because it was based solely upon race and additionally because, it will be shown, the DNA samples were taken from these black individuals (who otherwise were of disparate appearance) under circumstances that were legally and factually involuntary. *See, e.g., Kaupp v. Texas*, 538 U.S. 626 (2003) (per curiam) (concluding that the fact that a suspect said "okay" and acquiesced in accompanying officers to a police station did not make the seizure voluntary, particularly where the suspect was not informed that he had the right to ignore the request and continue about his business).

### Statement of Proposed Class

The Plaintiff proposes the following as his class definition in this matter:

As to Counts I and II, a class composed of all black males approached by officers of the Charlottesville Police Department during the period from January 1, 2002, through the present, who were requested to provide a DNA sample as part of the Department's "serial rapist investigation."[4]

As to Count III, a sub-class composed of those members of the above class from whom DNA samples were, in fact, taken.[5]

------

[4]Though the phrase "serial rapist investigation" may not be entirely free from ambiguity, counsel for the parties have agreed that they mutually understand what is meant by this phrase and the Defendants have been able to identify all of the members of the proposed class.

[5]Prior to the hearing on July 13 defense counsel expressed some consternation at what they apparently perceived to be the eleventh-hour identification of a "sub-class." However, Count III, as pled, can only affect those people from whom DNA samples were actually taken which group is, by definition, a sub-class of all of those people approached (the class identified in Counts I and II). Referring to those persons with claims under Count III as a sub-class is both technically accurate and nothing new.

In the Complaint the Plaintiff originally placed a temporal end on membership in the proposed class, seeking membership only for those approached on or before April 30, 2004. This was based upon the Plaintiff's belief at the time the Complaint was filed that the Defendants had terminated the challenged actions as of that date. Testimony of Defendant Longo at his deposition in the present case appears to reveal, however, that the challenged program remains ongoing through the present and for this reason the Plaintiff seeks to have the class extend beyond the April 30, 2004, date stated in the Complaint.[6] Because this works no change at all in the substantive claims and issues in the case, the Plaintiff respectfully submits that no formal amendment of the Complaint would be necessary.[7] Should the Court determine otherwise, however, the Plaintiff will seek leave to amend to eliminate the terminal date.

<u>Facts</u>

The facts before the Court at this time are those facts which were pled in the Complaint and not denied in the Defendants' Answer or contradicted by evidence adduced at the evidentiary hearing, as well as those drawn from the exhibits submitted to the Court at the evidentiary hearing. Though the facts relevant to making the determination on class certification are

---

[6]As set forth in more detail in the Fact section below, Defendant Longo Testified that in April 2004 certain changes were made to the DNA collection program procedures such as limiting who could initiate a request and what would be stated to people of whom requests were made. Implicit in these statements is that the program was not discontinued; if it had been, there would have been no need to make changes. Longo also testified that regular meetings designed, at least in part, to determine who to approach for DNA samples are still taking place.

[7]Because the Plaintiff did not understand the challenged policies to still be in force, he did not seek injunctive relief in the Complaint. If the policies are still in place, then injunctive relief would be merited.

limited, the following summary provides some additional background facts to provide context for the Court.

Sometime prior to April 1, 2002, citizens and law enforcement in Charlottesville became concerned about the possible presence in the area of a "serial rapist." (*See* Complaint, ¶ 18, setting the approximate time frame for the beginning of the challenged policy as "on or before April 1, 2002 "). An investigation ensued which involved the policies challenged in this case.

In response to the presence of this "serial rapist," the police department for the City of Charlottesville, under the direction of its chief, Defendant Longo, began what amounted to a virtual dragnet of black males to obtain DNA samples for comparison with DNA from one or more of the rapes. The samples were taken generally by buccal swab.[8] Officers of any rank and experience, including patrolmen (field officers) as well as investigators, have approached black male individuals to obtain DNA samples. (Deposition of Timothy Long ("Longo Dep."), at 45, describing change in April 2004 whereby patrol officers may no longer initiate such requests; Exhibit 1 to Longo Dep. (Refusal No. 16 initiated by patrol officer)); *see generally* description of process in Longo Dep. at 6-45). Defendants agree that 190 persons were approached through April 2004 to provide DNA samples under the program described above, thirty of whom refused the request to provide a sample. (See Longo Dep., Exhibits 1, 2, and 3). It is stipulated that all persons approached were black males. *See* Stipulation filed at evidentiary hearing on July 13, 2006.[9]

_____

[8]A buccal swab, based upon information and belief, involves swabbing with a cotton swab the inside of a person's cheek to obtain a DNA sample.

[9]The actual phraseology of the Stipulation is somewhat circuitous: "Each individual from whom a sample was requested . . . had skin color consistent with one or more of the descriptions of the assailant that were obtained . . . from the victims of the attacks. Each victim described her assailant as a black male."

Over the course of investigation, at least four different composite images of the assailant have been prepared. (*See* Transcript of Proceedings in the General District Court of Charlottesville, Jan. 31, 05, submitted as Exhibit 4 to Defendants' Motion for Partial Summary Judgment, filed March 22, 2006, ("Gen. Dist. Tr.") at 17-18).  The last rape believed connected with this individual occurred in August 2004.  (Longo Dep. at 40).   However, the procedures described below which are challenged in this case are, with a few modifications also discussed below, still in place.  (*See, e.g., id.* at 39 (meetings to determine who to approach for DNA samples are still taking place); 45 (modifications were made to operational procedures of the DNA collection program in April 2004, no indication that program was terminated)).

As individuals with recent criminal convictions generally already had DNA on file, they were not among those targeted as being "NOF" (NOF stands for "not on file").  (*See* Longo Dep. Exhibit 2 (answers to interrogatories), referring to, among other sources of names of black males to approach, the "DNA NOF - High Priority Candidates List.").   The "high priority" list, Longo explained,

> could simply be the product of a meeting.  For example, we might be talking about eight or nine or ten or three people. . . . We want to look at this guy, but we don't have his DNA. . . .

(Longo Dep. at 37).   In 2004, the meetings were weekly or bi-weekly, but are now either monthly, bi-weekly, or weekly (*id.* at 39).  As discussed below, Monroe was approached after being placed on such a weekly or bi-weekly list.

Beyond presumably excluding those whose DNA was already on file, at the time Monroe was approached, there was no policy which narrowed the pool of black males from whom

10

a buccal swab sample might be sought.  As Defendant Longo stated at his deposition, "the common thread among them [the proposed class members] is their race."  (Longo Dep. at 6). The "physical characteristics aside from race and sex varied widely."  (*Id.* at 8).  Though Longo provided a list of potential additional factors that could possibly result in a person being considered (ranging from prior criminal history, to calls to 911, to a person's acting suspicious) (*id.* at 8-9), he could not identify what factors were taken into consideration with respect to any specific class member and did not alter his summary conclusion that the only "common thread" was race.  There were no guidelines as to who should be approached other than black males.

> . . .. [T]he description that we obtained from victims about this suspect – one common thread  was that he was male and that he was African-American.  In addition to that there was a wide range of physical descriptors . . . which is anywhere from 5'6" to 5'7" to medium build to 6'2" and out of shape football player.

(Longo Dep. at 8).

Of the various composites compiled over the years, the chief detective for the investigation testified, "I don't believe any was deemed to be more reliable than the others." (Gen Dist. Tr. at 18).  Perhaps as a result, this chief investigator did not himself show officers on the street the composite.

> A:     Did I show them to them, no.
> Q:     Do you know who did?
> A:     They were distributed by an officer.  I can't tell you who showed them.

(Gen. Dist. Tr. at 21-22.)

As evidenced on the videotaped deposition of Plaintiff submitted to the Court, Plaintiff is a male of sufficient heft that his weight is a distinguishing feature.  Yet, although no female victim is reported to have described her assailant as having such a characteristic, Monroe, as

a black male, was nonetheless in the class of men approached for a sample.  (*See generally* Complaint; Gen. Dist. Ct. transcript, video deposition of Larry Monroe.)

When Monroe was approached, he was allegedly on the weekly list of names of those from whom DNA was sought.  (*See* Gen. Dist. Tr. 33-34)   He came to be on the list because, according to a report by patrol officer Sclafani, Sclafani had seen Monroe on Chancellor Street and considered that he "[m]ay have been scoping out houses."  (Gen. Dist. Tr. 38).

As Defendant Mooney explained, there are a number of ways to make "the list," including a call from Crimestoppers that someone looks like a composite, the individual's "prior background," or a "field contact."  (Gen. Dist. Tr. 49).  As Defendant Longo also acknowledged, a person could become a "person of interest,"  i.e., on the list (Longo Dep. 40) simply as a result of someone's calling Crimestoppers and saying "I just got a gut feeling, you need to check this guy out."  (Longo Dep. at  21).  As he confirmed,

> Q:      I mean, some guy is looking funny out on the street somebody reports, would they then run the NCIC and the DMV records, you know, prior to determining this is a person we need to add to our list to get a sample?"
> A:      More likely than not that would, that would take place.

(Longo Dep. at 35)

Thus, there were no guidelines or criteria for limiting those black males who would be approached.  Rather black males could become "persons of interest" (by which was meant a sample was sought) in any of a variety of ways, from field officers believing someone looked like a composite (*see* Longo Dep. Exhibit 1, Refusal 16), to field officers reporting a hunch, to some anonymous person phoning in that a black male was "acting funny."   The only unifying characteristic–the common thread–was race.

12

Three modifications to the program were requested by Defendant Longo in April 2004. (Longo Dep. at 45)  One of the three changes included, for the first time, that "patrol officers would not initiate requests for buccal swabs" (*Id.*).  "[T]hey would get information. . . and they would forward that information to an investigator.  The investigator would make a determination ... as to whether or not the person would be approached." (*Id*).  That is, prior to April 2004, patrol officers out on the street *did* initiate requests for buccal swabs.  A second modification was that the persons being approached "were to be told that they had the right to refuse if they so desired." (*Id.*)  The third modification was that the DNA samples would be destroyed.  (*Id.*)[10]

<u>Argument</u>

Rule 23 is designed to simplify the handling of cases that involve large numbers of parties having similar claims.  "Chief among the justifications for this device is its efficiency: adjudication of a properly-constituted class action generally has res judicata effect and 'saves the resources of both the courts and the parties by permitting an issue potentially affecting every [class member] to be litigated in an economical fashion.'"  *Thorn*, 445 F.3d at 318 (quoting *Califano v. Yamasaki,* 442 U.S. 682, 701 (1979)).  Though district courts must conduct a "rigorous analysis" to ensure compliance with Rule 23, paying "careful attention to the requirements of that Rule," *East*

---

[10] Longo described that the samples were themselves destroyed, along with, apparently, any consent form which was allegedly part of the envelope in which the samples were housed and for which no copies were made.  Longo, Tr. 42.  Plaintiff has no evidence to indicate that DNA swab samples are not being destroyed; however, the record does not disclose the manner in which DNA information was handled while in Richmond, communicated to Charlottesville, or otherwise whether the DNA information is still able to be retrieved from point along the chain.  This has not been a subject of discovery for class certification.

*Tex. Motor Freight Sys., Inc. v. Rodriguez*, 431 U.S. 395, 405 (1977), the Fourth Circuit has nonetheless held that within this context courts should give Rule 23 a "liberal rather than restrictive construction, adopting a standard of flexibility in application which will in the particular case best serve the ends of justice for the affected parties and . . . promote judicial efficiency." *Gunnells*, 348 F.3d at 424.

Trial courts do not conduct a preliminary inquiry into the merits of the suit as part of making the Rule 23 determination. *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 177-78 (1974). "[N]othing in either the language or history of Rule 23 . . . gives a court any authority to conduct a preliminary inquiry into the merits of a suit in order to determine whether it may be maintained as a class action. . . . In determining the propriety of a class action, the question is not whether the plaintiff or plaintiffs have stated a cause of action or will prevail on the merits, but rather whether the requirements of Rule 23 are met." *See Pitt*, 221 F.R.D. at 444 (a trial court is "prohibited" from conducting an inquiry into the merits when making the Rule 23 determination).   Whether the Plaintiff's claims will prevail, or how they might be established or defeated, are not part of the Rule 23 analysis.

## I.   THE ELEMENTS OF NUMEROSITY, COMMONALITY, TYPICALITY AND ADEQUACY REQUIRED UNDER RULE 23(a) ARE ESTABLISHED IN THIS CASE

### A.   The members of the proposed class and sub-class are sufficiently numerous that joinder of all of them in a single action would be impractical.

The Plaintiff proposes a class consisting of those members of the African-American community who were approached about providing DNA samples, and a sub-class consisting of those

who provided DNA samples.  In their answers to interrogatories the Defendants state that there are

190 individuals who fall into the first class and thirty who fall into the second.  Both of these

numbers are well in excess of the minimum number that courts have identified as meeting the

numerosity requirement of Rule 23(a).[11]  More importantly, joinder of all of these persons is not only

impractical but, for all intents and purposes, presently impossible since the Defendants are the only

ones with access to identification information for class members and they have refused to make this

information available to the Plaintiff.[12]

> **B.      The claims asserted in the Complaint challenge the actions
> of the Defendants on a broad, constitutional basis; the facts
> related to these claims are essentially undisputed and the legal
> issues are common to all class members.**

In Count I the Plaintiff challenges the action of the Defendants' in "adopting and

carrying out a policy of approaching members of a class supposedly resembling an alleged assailant

only when the alleged assailant is black and not when the alleged assailant is white" as being "race-

based discrimination not narrowly tailored to serve a compelling governmental interest."  Count I

thus challenges the Defendants' *policy*[13] on equal protection grounds.  The class members are, by

---

[11]If the temporal extent of the classes is extended as discussed above, this could only increase the number of potential class members and would thus only strengthen the Plaintiff's argument on numerosity.

[12]The present case is not one where the Plaintiff could readily and independently determine the names of the other class members, such as a case where all of the class members are former employees of a particular company.  The members of the class in the instant case were members of the public approached on the basis of criteria which the Defendants have not identified and which were drawn from no subclass of the community other than their race.  There is no possible way for the Plaintiff to identify other class members other than by sheer luck.

[13]As noted above, this one policy gives rise to two claims in this case: (1) the race-based decision to approach each individual class member, and (2) the race-based decision to use DNA sampling of members of the public to establish innocence.

definition, people who were affected by the policy.  Thus Count I presents really just a legal challenge to the policy of using this particular investigative approach when an assailant is black, and to the policy of approaching class members solely because of their race, the resolution of which will of necessity be common to all members of the class–there are no individual facts which could affect the outcome of this claim with respect to the individual class members.

At the evidentiary hearing there was much discussion by the Defendants of the various criteria that were allegedly used by the police in determining who to approach, and they argued that the use of these criteria would necessarily require a class-member by class-member, fact-based analysis to determine whether each individual was discriminated against on the basis of race. This approach misses the point of the Plaintiff's claim, however.  While the Defendants *claim* that race was not the only factor and that other criteria were considered (race "plus"), the Plaintiff's claim is that race was *a* factor and that this is sufficient to complete the Plaintiff's claim.  If the actual claim asserted by the Plaintiff is analyzed, there can and will be no individualized, fact-based determination with respect to class membership–the only issue will be whether a proposed class member is black and the Defendants have conceded that they are.[14]

Count II alleges a Fourth Amendment claim which is, again, identical as to all of the class members.  Count II alleges that the encounters with the class members were unreasonable under the Fourth Amendment.  Because by definition all class members were approached, there will

---

[14]While there was argument by the Defendants at the evidentiary hearing that there would need to be individualized analysis as to each class member about the multiple factors that, the Defendants contend, led to that person being approached, as long as race was a factor then strict scrutiny will apply–regardless of the presence of other factors, *see Grutter*, 539 U.S. 306 (applying strict scrutiny in a race plus scenario)–and the Plaintiff contends that this will be fatal to the Defendants' case.  Consequently, no individualized analysis of the other factors will be required.

be no factual issue about whether contact took place.  Count III also presents a Fourth Amendment claim, but addressed to the sub-class of Plaintiffs who actually provided DNA samples.  This count alleges that taking of the DNA samples constituted unreasonable seizures.  As with the other claims, because the class is limited only to people who provided samples, and the Defendants can identify who those people are, there will be no factual issues regarding class membership.

At the evidentiary hearing the Defendants asserted that whether individual class members consented to the encounters would be dispositive of the claims and would necessitate individualized factual determinations precluding a finding of commonality.  This again misperceives the Plaintiff's claim and ignores the actual way in which Rule 23's commonality requirement is applied.

As noted above, the Rule 23 commonality provision does not require that *all* issues be common to all class members, but only that *at least one* question of law or fact be common to all class members.  *Pitt*.  Class action securities cases are a good example.  The fact that each individual class member will have to establish that he acquired stock during the relevant time period, that he did not engage in acts which would preclude his claims and that he is not otherwise barred has not stopped courts from certifying classes; class certification is appropriate because of the common issues of fraud on behalf of the corporate defendants and individualized determinations of eligibility for recovery are left for later processes.

In the present case the Plaintiff asserts that the encounters violated the Fourth Amendment and the Plaintiff contends that facts common to all of the encounters will establish that they were "seizures" actionable under the Fourth Amendment.  Even if this position is not ultimately successful, though, it does not mean that commonality is lacking; it simply means that after the

17

shared legal and factual questions that are subsumed in Count II have been addressed, if the Defendants are able to establish in an individual case that the encounter may truly have been consensual then that issue may need to be more fully explored as to that individual.

There are questions of law common to the proposed class in this case, i.e., ones that can be resolved for each class member in a single hearing, such as the question of whether the Defendants' policy of approaching the class members was generally violative of the Fourth Amendment–if it was not, then the class as a whole cannot prevail; if it was then it may be that consent will be an issue as to some class members but this will not make the common questions magically disappear. The requisite commonality has therefore been shown. *See Thorn*, 445 F.3d at 319.

> **C.    Mr. Monroe's claims are, for all practical purposes, identical with those of the other members of both the proposed class and the proposed sub-class and his claims are thus typical of those of the other class members**.

To satisfy the typicality requirement, the representative party's interest in prosecuting his own case must simultaneously tend to advance the interests of the absent class members; a plaintiff's claim cannot be so different from the claims of absent class members that their claims will not be advanced by plaintiff's proof of his own individual claim. *Deiter*, 436 F.3d at 466. It is important to note that the typicality requirement of Rule 23(a) is aimed at the typicality of the representative's *claims,* not his facts. "[I]t is not necessary that the claims of the named representatives and those of class members be *factually* identical. Rather, the named plaintiff must simply be part of the class and possess the same interest and suffer the same injury as the class members." *Pitt*, 221 F.R.D. at 445 (internal citations and quotations omitted, emphasis added).

"Factual variances in the amount of damages claimed, or differences in the availability of certain defenses against the representative plaintiffs, does not prohibit a finding of typicality as long as the claims are based on the same legal or remedial theory." *Jeffreys v. Communications Workers of Am.*, 212 F.R.D. 320, 322 (E.D. Va. 2003).   The requirement of typicality is to ensure that the representative will want to pursue the matter for the benefit of all, rather than having some peculiarity in his claim that would make him reluctant to vigorously pursue a claim.

Though the Fourth Circuit has noted that typicality does not require that the plaintiff's claim and the claims of class members be "perfectly identical or perfectly aligned," *id*. at 467, that is, in essence, the situation in the present case.  Given that the claims in the present case are almost entirely law based, as goes the Plaintiff's claim so will go the claims of the other class members; the Plaintiff has just as much desire to fully and vigorously pursue the claims in this case as does any other class member.  Even if there are factual distinctions among the various class members with respect to issues of what factors led to their being approached, or defenses such as consent, these factual distinctions do not detract from the typicality of the Mr. Monroe's *legal claims*.

### D.    Mr. Monroe and his counsel will adequately represent the interests of the class members.

A proposed class representative will adequately represent the class where that person (I) does not have interests that are adverse to the interests of the class, (ii) has retained competent counsel, and (iii) is otherwise competent to serve as class representative.  *In re Cable and Wireless, PLC, Securities Litigation*, 217 F.R.D. at 375 n.5.[15]

---

[15]Co-counsel for Mr. Monroe have substantial experience in handling litigation, appearing in federal court and representing plaintiffs in civil rights actions.  Both attorneys are admitted to all state and federal courts in this jurisdiction.  Mr. Walters clerked for a judge of this Court, has been in private practice since 1993 and has been the supervising attorney for the University of Virginia

As set forth above, Mr. Monroe's claims are indistinguishable from those of the other class members. Consequently, there is nothing about the factual predicate for his claim that would make his interests adverse in any way to those of the rest of the class members. Defendant Longo at his deposition indicated that he was unaware of facts which made Mr. Monroe's situation unique, rather succinctly stating that "the common thread among them [the proposed class members] is their race." (Longo Dep. at 6). He further indicated that on a personal level his interaction with Mr. Monroe has been cordial (Longo Dep. at 4, 5). Mr. Monroe testified that his desire in pursing this action was to seek "closure" and compensation for the injury to his constitutional rights, goals which are certainly shared by the other members of the class as well.

In determining whether a proposed class representative can serve competently in that role courts look to a variety of factors. Plaintiffs may be found to be inadequate representatives where they lack personal knowledge concerning the type and extent of damages they have suffered, where they lack credibility concerning their liability claims, or where they have afforded their attorneys unfettered discretion to conduct the litigation. *Robinson*, 219 F.R.D. at 186. "This inquiry into the knowledge of the representative is to ensure that the party is not simply lending his name to a suit controlled entirely by the class attorney; the named party must be an adequate representative in addition to having adequate counsel." Charles Allen Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 1766 (2d ed. 1986).

---

School of Law appellate litigation clinic (the case load of which is limited almost exclusively to federal civil rights and post conviction relief cases) for more than ten years. Ms. Wyatt has represented plaintiffs in civil rights cases in the Charlottesville area for decades and has successfully argued before the United States Supreme Court. At the hearing on July 13 counsel for the Defendants' stipulated to the competency of counsel for the Plaintiff in this action to serve as class counsel and this element is therefore not in issue.

20

Similarly, a class representative may be found to be inadequate if he has physical or mental limitations which may preclude him from being in a position to act in the best interest of the class.  "Having a fiduciary obligation to the putative class, class representatives must have the character and means to carry out that obligation including the abilities to examine independently the decisions of counsel and to play an active role in the litigation for the protection of the interests of the class." *Robinson*, 219 F.R.D. at 186.

Unlike the types of class-action cases which have drawn the ire of legislatures lately–such as suits over the width of computer monitor screens–this case involves direct physical acts against the class members.  Mr. Monroe is well aware of what was done to him and the impact that it had on him.  His credibility on issues of liability would appear to be unimpeachable as the Defendants agree that he was one of the people approached and that he provided a DNA sample.  There is no evidence that Mr. Monroe has any physical or mental conditions that would negatively impact his ability to serve as class representative.  Though at his deposition Mr. Monroe was unclear as to why the case was in federal court (though he did explain that he agreed with it being there because he thought the state court decision was wrong), a lay person's lack of knowledge over the interplay between federal and state court jurisdiction is unsurprising.  Deferring to counsel's judgment as to the appropriate forum in which to pursue claims is hardly ceding entire control of the case to counsel.

Mr. Monroe would make an appropriate class representative and present counsel are more than adequately competent to pursue this matter as a class action.

In conclusion, the evidence more than sufficiently establishes that the existence of the required elements of numerosity, commonality and typicality, and the evidence also demonstrates

that Mr. Monroe would be a proper class representative and that counsel are sufficiently competent to pursue this matter.  Accordingly, the elements of Rule 23(a) have been established.

## II. THE REQUIREMENTS OF RULE 23(b) HAVE BEEN SATISFIED IN THAT THE DEFENDANTS HAVE ACTED ON GROUNDS THAT ARE GENERALLY APPLICABLE TO THE CLASS AS A WHOLE.

In addition to meeting all of the requirements of Rule 23(a), before a class can be certified the proponents of the class must also establish that at least one of the criteria under Rule 23(b) is met.  In the Complaint the Plaintiff alleges that Rule 23(b)(2) is applicable because the "the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole...." Rule 23(b)(2).[16]  That this is so would, again, appear to be undisputed in this case.  The underlying claim is that the Defendants adopted a policy of interacting with African-American males and asking them to provide DNA samples in order to establish their innocence.  It is undisputed that such a policy was adopted and carried out by the Defendants–the nature and existence of the policy was the subject of spirited public debate during the time it was in effect.  The Defendants have admitted the existence of this policy in the present case.

All of the claims in this case arise directly from the existence and carrying out of this policy and, consequently, the Defendants acted on grounds that will be generally applicable to–if not outright determinative as to–the class as a whole.

---

[16]Rule 23(b)(1) does not apply in this case.  *See Amchem*, 521 U.S. at 614 (describing Rule 23(b)(1) as being aimed at "cases where the party is obliged by law to treat the members of the class alike (a utility acting toward customers; a government imposing a tax), or where the party must treat all alike as a matter of practical necessity (a riparian owner using water as against downriver owners)").

22

Though Rule 23(b)(2) makes no reference to the presence or absence of a request for monetary relief, in light of the Advisory Committee notes to the rule, courts have generally held that Rule 23(b)(2) certification is appropriate only when issues relating to declaratory and injunctive relief "predominate." *Thorn*, 445 F.3d at 329-30; *see Pitt*, 221 F.R.D. at 451 ("certification is also appropriate [under Rule 23(b)(2)] when plaintiffs seek compensatory and punitive damages so long as such damages are ancillary to the claims for injunctive or declaratory relief.").  As both the Supreme Court and the Fourth Circuit have noted, civil rights cases challenging actions taken by defendants on the basis of race are "prime examples" of the type of cases at which Rule 23(b)(2) was directed.  *Amchem Prods. v. Windsor*, 521 U.S. 591, 614 (1997); *Thorn*, 445 F.3d at 330, and damages are, of course, recoverable in such actions.

The claim for damages in the present case is for the infringement of the Plaintiff's constitutional rights and is therefore ancillary to this claim.  As is often the case in civil rights actions, the measure of damages is not likely to be personalized in the traditional sense of the word, such as in a personal injury tort action where medical bills, lost wages and pain and suffering would be at issue.  In the instant case the award of damages will not necessarily be nominal in a financial sense, but most likely uniform across the class membership as the injury suffered by all of them was the same and the injury was to their constitutional rights as opposed to their bodily integrity.  In cases similar to the present courts have rejected challenges to Rule 23(b)(2) certification of constitutional claims which sought monetary relief in addition to injunctive relief. *See, e.g., Pitt*, 221 F.R.D. at 451 (holding that claims alleging violations of the Thirteenth and Fourteenth Amendments and the Fair Housing Act could properly be certified under Rule 23(b)(2) because the requests for monetary damages on these claims were ancillary).

23

Even if the Court were to find that individual issues of damages would not appropriately be certified under Rule 23(b)(2), a court may certify portions of claims under different portions of Rule 23(b).  *See, e.g., Pitt*, 221 F.R.D. at 442, 448-49 (certifying constitutional and some statutory claims under Rule 23(b)(2) and other statutory claims under Rule 23(b)(3)).  The Court could, for example, certify a class under Rule 23(b)(2) on the legal issues and certify a class under Rule 23(b)(3) as to damages.[17]

Conclusion

The Plaintiff has satisfied the requirements of Rule 23(a) in that the size of the class is sufficiently numerous, there is at least one question of law or fact common to all of the class members, the Plaintiff's legal claims are typical of those of the class and he will be an adequate representative will to vigorously pursue this action.  Moreover, Rule 23(b)(2) is satisfied because the actions of the Defendants have been uniform with respect to the class making declaratory and injunctive relief appropriate.  Accordingly, the request for class certification should be granted.

Respectfully submitted,

LARRY MONROE,

by counsel.

---

[17]Before certifying a class under Rule 23(b)(3) the Court must make additional findings regarding the requirements specific to Rule 23(b)(3).  As the Plaintiff does not believe that resort to Rule 23(b)(3) is required in this case, and in order to not further lengthen the present memorandum, the Plaintiff has not addressed the specific requirements of Rule 23(b)(3).  Should the Court so direct, however, the Plaintiff would be happy to address the satisfaction of the requirements of Rule 23(b)(3).

24

**s/Neal L. Walters**
Neal L. Walters, Esq.
Virginia State Bar No. 32048
Attorney for Plaintiff
Scott│Kroner PLC
418 East Water Street
P.O. Box 2737
Charlottesville, VA 22902
Telephone: (434) 296-2161
Fax: (434) 293-2073
E-mail: nwalters@scottkroner.com

**s/Deborah C. Wyatt**
Deborah C. Wyatt, Esq.
Virginia State Bar No. 17918
Attorney for Plaintiff
300 Court Square
Charlottesville, VA 22902
(434) 296-4130
(434) 297-3083 (fax)
Dwesq@aol.com

<small>42991:NLWC:\Documents\Client Files\General Legal\Monroe, Larry\Amended Memorandum in Support of Motion for Class Certification.wpd</small>

---

## <u>CERTIFICATE OF SERVICE</u>

   I hereby certify that on July 25, 2006, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

Richard H. Milnor, Esq.
Alvaro A. Inigo, Esq.
Zunka, Milnor, Carter & Inigo, Ltd.
P.O. Box 1567
Charlottesville, VA 22902

and I hereby certify that I have mailed by United States Postal Service the document to the following non-CM/ECF participants: N/A.

      **s/Neal L. Walters**
      Neal L. Walters, Esq.

Attorney for Plaintiff
Scott│Kroner PLC
418 East Water Street
P.O. Box 2737
Charlottesville, VA 22902
Telephone: (434) 296-2161
Fax: (434) 293-2073
E-mail: nwalters@scottkroner.com