IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Charlottesville Division

LARRY MONROE, on behalf of himself and
all others similarly situated,

       Plaintiff,

v.

CITY OF CHARLOTTESVILLE, VIRGINIA,
et al.,

       Defendants.

Civil Action No. 3:05-cv-00074

## PLAINTIFF'S MEMORANDUM IN OPPOSITION TO THE DEFENDANTS' MOTION TO DISMISS

In this action under 42 U.S.C. § 1983, the Plaintiff alleges that a policy adopted by the Defendants of approaching black men and asking them to provide samples of their bodily fluids so as to establish that they were not a serial rapist being sought by the Defendants violated his rights, and the rights of those similarly situated, to equal protection and to be free from unreasonable seizures. The Defendants have moved to dismiss Counts I and II of the Amended Complaint and this memorandum is submitted in response to the Defendants' motion.[1]

---

[1]The Defendants have not moved to dismiss Count III, which presents an unreasonable seizure claim based upon the actual taking of the DNA sample.

Applicable Legal Standard

"The function of the motion to dismiss . . . is to test the law of the claim and not the facts which support the claim." *Jordon v. Bowman Apple Products Co., Inc.,* 728 F. Supp. 409, 411 (W.D. Va. 1990) (citation omitted). *See Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999) ("[t]he purpose of Rule 12(b)(6) is to test the sufficiency of a complaint" and not to "resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses.") The Court must take all of the factual allegations in the Complaint as true and then determine whether the Plaintiff has stated legally viable claims for relief. "[A] complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957); *Jordon*, 728 F. Supp. at 411. The *Conley* test is prospective, not retrospective; it looks to what a plaintiff can show, not what he has shown. *Jordon*, 728 F. Supp. at 411.

Argument

To state a race-based claim under the Equal Protection Clause, a plaintiff must allege that a government actor intentionally discriminated against him on the basis of his race. *Brown v. City of Oneonta*, 221 F.3d 329, 337 (2d Cir. 1999). "There are several ways for a plaintiff to plead intentional discrimination that violates the Equal Protection Clause [direct discrimination]. A plaintiff could point to a law or policy that 'expressly classifies persons on the basis of race.' Or, a plaintiff could identify a facially neutral law or policy that has been applied in an intentionally discriminatory manner [disparate treatment]. A plaintiff could also allege that a facially neutral

statute or policy has an adverse effect and that it was motivated by discriminatory animus [disparate impact]." *Id.* (Citations omitted).

As the Supreme Court and the Fourth Circuit have made clear, "all racial classifications, imposed by whatever federal, state, or local government actor, must be analyzed by a reviewing court under strict scrutiny. In other words, such classifications are constitutional only if they are narrowly tailored measures that further compelling governmental interests." *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 227, 132 L. Ed. 2d 158, 115 S. Ct. 2097 (1995); *Williams v. Hansen*, 326 F.3d 569, 575-76 (4th Cir. 2003).

**In order to state an equal protection claim a plaintiff need not allege the existence of a comparable group that is in all respects identical to the plaintiff other than race; it is sufficient that the other group be "similarly" situated**

In Count I, the Plaintiff alleges that the Defendants violated his equal protection rights in two distinct ways: (1) by having a policy of approaching African-Americans to provide DNA samples when investigating crimes where the suspect is black, but not approaching Caucasians and asking them to provide DNA samples when the suspect is white–a disparate treatment claim, and (2) by targeting the Plaintiff in this case because of his race–a direct discrimination claim.

The Defendants argue that the first equal protection claim must fail because the Plaintiff has not alleged the existence of a comparable group outside of the protected class, the Defendants' conduct towards which could be compared to the conduct towards the Plaintiff. They contend that there must be an identical group in the white community– a serial rapist situation where all of the victims have identified the assailant as being white–before the Plaintiff can pursue a disparate treatment claim. The central fallacy in this argument is that it assumes that in order to

3

establish actionable disparate treatment the Plaintiff must allege the existence of a mirror image situation. However, conspicuously absent from the Defendants' motion is any citation to any authority for this implicit proposition. There is no legal basis for requiring the Plaintiff to allege the existence of a serial rape case involving a white assailant. It is enough for the Plaintiff to allege, as he has, that in prior cases where DNA evidence has been obtained–in any type of crime–and the assailant has been identified as a white individual, the police have not adopted a policy of approaching white people at random to provide DNA samples. The nature of the crime being investigated, other than that it is one where DNA evidence is available, is not legally relevant.

> **The Plaintiff has alleged intentional, race-based classification; the fact that race was identified by the victims does not, after the Supreme Court's decision in *Grutter*, make the classification non-race-based or remove it from strict scrutiny analysis.**

With respect to the second part of the Plaintiff's equal protection claim in Count I, the direct discrimination claim, though the precise basis of the Defendants' argument is not free from doubt, the argument appears to boil down to this statement: "Monroe does not allege that the state provided the description of the alleged serial rapist. Rather Monroe admits that the description of the serial rapist originated with the victims of the rapist. Accordingly, the description is a legitimate classification for the Charlottesville Police Department to use as a part of its investigatory process." (Motion to Dismiss at 5).[2] Given the Supreme Court's holding in *Adarand Contractors, Inc.*, the

---

[2] The Defendants also state: "Significantly, Monroe does not allege discriminatory animus or intent by the Defendants." However, the Defendants do not appear to make this supposed failure a basis for their motion to dismiss the direct discrimination claim. Unlike 42 U.S.C. § 1981, which requires an express allegation of racially discriminatory intent or animus, an equal protection claim brought under § 1983 must allege only that intentional discrimination has taken place. *Brown v. City of Oneonta*, 221 F.3d 329, 337 (2d Cir. 1999). While a plaintiff may make the requisite showing by alleging intentional discrimination or discriminatory animus, a plaintiff may also make the requisite showing by "point[ing] to a law or policy that 'expressly classifies persons on the basis of race.'"

Defendants must be arguing as a matter of law that either no racial classification has been made by them, or that such classification survives strict scrutiny.

An important component of the Defendants' argument is not spelled out by them. By "description" the Defendants can mean only the *racial* description, i.e., black. At this point in the case this is the only component of the description given by the victims, other than gender, that is known and alleged.[3] Thus what the Defendants argue is that, *as a matter of law*, as long as the victims have described the assailant as a black male, and nothing more, there is no set of facts which the Plaintiff could prove under which stopping all black men in Charlottesville and asking them to provide DNA samples would violate the Equal Protection Clause.

In support of this broad proposition the Defendants cite three cases. The first is *Brown v. City of Oneonta*. In *Brown*, an elderly woman reported that a young, black male had assaulted her in her home with a knife and that during the assault he had cut his hand with the knife. Over the following days the local police stopped and questioned non-white persons on the street and inspected their hands for cuts.

The Second Circuit ruled that no equal protection violation had been shown because the plaintiffs had "not identified any law or policy that contains an express racial classification." *Brown*, 221 F.3d at 337. This was so, the court concluded, because in addition to race the

---

*Id.* (Citation omitted). This is precisely the path taken by the Plaintiff in this case and it is all that is required under Fed. R. Civ. P. 12(b)(6).

[3]By agreement of the parties, all discovery in the case had been stayed pending resolution of the Plaintiff's request for class certification. Prior to ruling on the merits of the request for class certification, the Court granted leave to the Plaintiff to file an amended complaint and the Plaintiff has assumed that the prior agreement staying discovery remains in effect. As a result, no discovery on the substantive factual issues has yet taken place.

description, and therefore the criteria used by police, included not only race, but also age, gender and the possibility of a cut on the hand. *Id*.

    As a general matter, the Second Circuit's statement that the plaintiffs had failed to identify a policy containing an express racial classification has been roundly criticized. *See, e.g.,* Richard A. Primus, *Equal Protection and Disparate Impact: Round Three*, 117 Harv. L. Rev. 493, 512 ("Oneonta raises the question of why a court staffed with intelligent judges would deny the existence of a racial classification in that case."). Clearly the plaintiffs in *Brown* did identify a race-based policy;[4] the court appears, however, to have concluded that because other criteria were also identified–age, gender and a cut on the hand–the policy was not solely race-based and therefore not subject to strict scrutiny.[5]

    This approach cannot survive after the Supreme Court's decision in *Grutter v. Bollinger*, 539 U.S. 306 (2003). In *Grutter*, the Court concluded that even though race was only one factor "among many" considered by the government, the use of race as even one of the factors nonetheless created a race-based policy that mandated strict scrutiny of the entire program. However

_____

[4]This seems patently obvious from the discourse between the various camps in the Second Circuit's decision denying rehearing en banc. *Brown*, 235 F.3d 769, 772-73 (2d Cir. 2000) (Walker, C.J., concurring in denial of rehearing en banc) (noting that police work sensibly relies on racial descriptions every day, that the finding of a racial classification would require the application of strict scrutiny, and that strict scrutiny is and should be almost impossible to withstand); *id.* at 786 (Calabresi, J., dissenting from denial of rehearing en banc) ("The problem is that the strict scrutiny criteria developed by the Supreme Court are much too blunt. If an action is deemed a racial classification, it is very difficult, under the Supreme Court precedents, ever to justify it."). The court seems to have been well aware that a racial classification was involved but unwilling to say so because of the perceived difficulty this would create for the police.

[5]The court's reason for denying the obvious can, as is indicated in footnote 3 above, be traced to its concerns derived from Justice Marshall's famous observation that strict scrutiny analysis is "strict in theory, but fatal in fact." *Fullilove v. Klutznick*, 448 U.S. 448, 519 (1980) (Marshall, J., concurring). After *Grutter* this is no longer always so.

"loath," Primus, 117 Harv.  L. Rev. at 513, the Second Circuit may have been to do so before *Grutter*, the only approach now is to acknowledge that because race is a factor, police are applying a race-based policy and to subject that policy to strict scrutiny.  *Id*.

Determining whether the policy in this case passes strict scrutiny review is, of course, entirely inappropriate at the Rule 12(b)(6) stage.  There are any number of factual issues, none of which are in the record and upon which substantial discovery awaits, which would impact the ultimate conclusion on this matter.  Without limiting the number of issues in anyway, it would seem to be almost indisputable that there could not have been more narrowly-tailored ways of acting upon the information available to the Defendants than to approach almost 200 African-American men who, it is alleged, had nothing in common other than their race, on the street, to seek DNA samples.[6]

More specifically, even if the holding in *Brown* remained viable after *Grutter*, the facts in *Brown* are distinguishable from the present because, it is alleged, there were no factors other than race and gender at issue in the present case.  There was no "cut on the hand" or any other factor separable from race that lead the Defendants in the present case to approach the Plaintiff and the other members of the proposed class.

---

[6]Indeed, at least one commentator has suggested that it is unlikely that even the fact pattern in *Brown*, where in addition to race and gender there was also age and a cut on the hand, could survive strict scrutiny even under the relaxed standards after *Grutter*.  Michael R. Smith, *Depoliticizing Racial Profiling: Suggestions for the Limited Use and Management of Race in Police Decision-Making*, 15 Geo. Mason U. Civ. Rts. L.J. 219, 236 (2005) ("In Brown, officers questioned young minority males based on a description that included age, gender, race, and the possibility of a cut on the hand.  But the actual application of these criteria still produced a dragnet-type investigation that swept more than 200 people into its net. Thus, race was not used as a 'plus' factor in the investigation but as the primary motivation for singling out some citizens but not others. No other relevant indicators of suspicion were used, nor was any attempt made to link specific individuals to the crime. . . .[These criteria] are not sufficiently tailored to survive even the loosened strict scrutiny standard from Grutter.") (Footnotes omitted).

As noted above, the Defendants also cited two other cases in support of their argument.  The first of these two, *United States v. Travis*, 62 F.3d 170 (6th Cir. 1995), is, for present purposes, indistinguishable in its holding from *Brown* in that the dispositive factor in the court's analysis was the fact that there were other factors in addition to race that the police relied upon.  Because of these other factors, the court reasoned, strict scrutiny would not apply.  The decision in *Grutter* undercuts *Travis* for the same reason that it undercuts *Brown*.

The final case, *Hall v. Pennsylvania State Police*, 570 F.2d 86 (3d Cir. 1978), is, at least at the outset, a case favorable to the *Plaintiff* in that the court found that a police policy of requesting that banks photograph all suspicious black customers, but not suspicious customers of other races, violated the Equal Protection Clause.  In ruling, however, the court stated that "This is not a situation where suspects are being sought on the basis of descriptions which include race as well as other physical characteristics."  Though the Third Circuit drew no conclusion from this statement, the Defendants presumably read into this dicta a conclusion that if some "other physical characteristics" are considered then the race component would not be improper.  At the risk of beating the rhetorical dead horse, this is not a viable legal argument after *Grutter*, and the case is factually distinguishable from the present case in that the Plaintiff specifically alleges in the present case that the single physical characteristic in common among all of the proposed class members is race, as Defendant Longo admitted in his deposition.

In summary, the Defendants argue, based on three cases all of which pre-date *Grutter*, that the hypothetical presence of additional factors besides race must result in the policy at issue in this case being constitutional as a matter of law.  This is incorrect for two reasons.  First, because under *Grutter* a policy which includes race in addition to other factors must still be subjected to strict

scrutiny as a race-based policy.[7]  Second, the Defendants' argument is also incorrect in that it ignores

the Plaintiff's allegation that race was the *only* factor in common in this case.  In order to contend

that some factor other than race was at issue in this case the Defendants would have to go outside

the pleadings, which cannot be done on a Rule 12(b)(6) motion.

> **The motion to dismiss Count II assumes that the encounter between the Plaintiff and Officer Mooney was consensual, an assumption which is not proper at the Rule 12(b)(6) stage.**

The Defendants also move to dismiss Count II.  In this Count the Plaintiff alleged that

his encounter with the police was an unreasonable seizure in violation of the Fourth Amendment.

The Defendants state that under *Florida v. Bostick*, 501 U.S. 429 (1991), Officer Mooney was

allowed to have a consensual encounter with the Plaintiff without the Fourth Amendment being

implicated.  Implicit in this argument is the Defendants' claim that there is, as a matter of law, no

set of facts which the Plaintiff *could* prove which would render the encounter nonconsensual.

The Supreme Court's pronouncements after *United States v. Mendenhall*, 446 U.S.

544 (1980), have restated and refined the framework through which seizure allegations should be

analyzed. The Court has recognized that for purposes of applying the objective test of coercion, when

a person has no desire to leave the scene of an encounter with police, "the degree to which a

reasonable person would feel he or she could leave is not an accurate measure of the coercive effect

of the encounter." *Bostick*, 501 U.S. at 435-36. In such a situation, "the appropriate inquiry is

whether a reasonable person would feel free to decline the officer's request or otherwise terminate

the encounter." *Id*. at 436.  This test calls for a "contextual approach," that takes into account all of

---

[7]Moreover, the Plaintiff has alleged that there was no factor other than race in common and at the Rule 12(b)(6) stage this must be taken as true.

the circumstances surrounding the incident.  *See Michigan v. Chesternut*, 486 U.S. 567, 572-573 (1988); *I.N.S. v. Delgado*, 466 U.S. 210, 215 (1984); *United States v. Springer*, 946 F.2d 1012, 1016 (2d Cir. 1991); *United States v. Rose*, 889 F.2d 1490, 1493 (6th Cir. 1989) ("What constitutes a restraint on liberty prompting a person to conclude that he is not free to leave will vary with the police conduct at issue and the setting in which the conduct occurred."). The Supreme Court has identified a number of factors that might suggest that a seizure has occurred, even where the person who may have been seized did not attempt to leave, including the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled.  *Mendenhall*, 446 U.S. at 554 (citations omitted).

There are any number of factors which the Plaintiff could prove which would render the encounter between him and Defendant Mooney nonconsensual.  As the Plaintiff has stated in his memorandum previously submitted in support of the request for class certification, the Plaintiff intends to establish that the nature of all of the encounters with class members was nonconsensual given the environment at the time, the general relationship between the police department and members of the minority community, the locations in which the encounters took place, the techniques used by the officers in making their requests and other factors.

Rule 12(b)(6) is a particularly inappropriate stage at which to resolve the issue of consent, since such a determination is intensely fact-based and depends upon a variety of facts which need not be plead in the complaint.  As the Defendants know, having taken the deposition of the Plaintiff previously, he did not feel free to decline to respond to Officer Mooney's questions and go

10

on his way.  Resolution of the question of consent is therefore inappropriate at the present juncture

and the motion to dismiss should be denied.

       In conclusion, the Defendants' motion to dismiss should be denied and the Court

should take up the Plaintiff's request for class certification.

       Respectfully submitted,

       LARRY MONROE,

       by counsel.


**s/Neal L. Walters**
Neal L. Walters, Esq.
Virginia State Bar No. 32048
Attorney for Plaintiff
Scott │ Kroner PLC
418 East Water Street
P.O. Box 2737
Charlottesville, VA 22902
Telephone: (434) 296-2161
Fax: (434) 293-2073
E-mail: nwalters@scottkroner.com

**s/Deborah C. Wyatt**
Deborah C. Wyatt, Esq.
Virginia State Bar No. 17918
Attorney for Plaintiff
300 Court Square
Charlottesville, VA 22902
(434) 296-4130
(434) 297-3083 (fax)
Dwesq@aol.com

42991:NLWC:\Documents\Client Files\General Legal\Monroe, Larry\Plaintiff's memorandum in Response to Defendants' Motion to Dismiss.wpd

---

## CERTIFICATE OF SERVICE

    I hereby certify that on September 25, 2006, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

Richard H. Milnor, Esq.
Alvaro A. Inigo, Esq.
Zunka, Milnor, Carter & Inigo, Ltd.
P.O. Box 1567
Charlottesville, VA 22902

and I hereby certify that I have mailed by United States Postal Service the document to the following non-CM/ECF participants: N/A.

           **s/Neal L. Walters**
           Neal L. Walters, Esq.
           Attorney for Plaintiff
           Scott │ Kroner PLC
           418 East Water Street
           P.O. Box 2737
           Charlottesville, VA 22902
           Telephone: (434) 296-2161
           Fax: (434) 293-2073
           E-mail: nwalters@scottkroner.com